IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EARLENE SHORT DILLE,                              CV 07-615-MA

           Plaintiff,                             OPINION AND ORDER

v.

MICHAEL ASTRUE,
Commissioner of Social
Security,

           Defendant.

TIM WILBORN
Wilborn Law Office, P.C.
19093 S. Beavercreek Road, PMB # 314
Oregon City, OR 97045
(503) 632-1120

           Attorneys for Plaintiff

KARIN J. IMMERGUT
United States Attorney
BRITANNIA I. HOBBS
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1158


1 - OPINION AND ORDER

DAVID R. JOHNSON
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 MS/901
Seattle, WA  98104-7075
(206) 615-2545

      Attorneys for Defendant

MARSH, Judge.

     Plaintiff Earlene Short Dille seeks judicial review of the final decision of the Commissioner denying her May 13, 2003, application for supplemental security income benefits (benefits) under Title XVI of the Social Security Act, 42 U.S.C. § 1281-83f.

     On the date of the Commissioner's final decision, plaintiff was 48 years old.  She has two years of college and before the onset of her alleged disability she worked as a veneer grader, rural mail carrier, and computer chip quality control checker. After she filed her disability claim, plaintiff worked part-time as a butcher's assistant from 2001-2005, and part-time as a receptionist at H&R Block during 2002-2003.

     Plaintiff claims she has been disabled since November 25, 1997, following an automobile accident in which she suffered a sprain, whiplash, and possible nerve damage to her neck.  Her claim was denied initially and on reconsideration.  The Administrative Law Judge (ALJ) held a hearing on September 22, 1999, and on December 18, 2000, issued a decision that plaintiff was not disabled.  Plaintiff timely appealed the decision to the Appeals Council.  Unfortunately, on March 21, 2004, the Appeals

2 - OPINION AND ORDER

Council reported that plaintiff's file could not be located and remanded the case to the ALJ for a new hearing, which was held on August 10, 2005.  On August 27, 2006, the ALJ issued a decision that plaintiff was not disabled.  The Appeals Council denied plaintiff's request for review.  The ALJ's decision, therefore, became the final decision of the Commissioner for purposes of review.

Plaintiff seeks an order from this court either reversing the Commissioner's decision and remanding the case for an award of benefits or remanding the case for further proceedings with instructions.

For the following reasons, the final decision of the Commissioner is **AFFIRMED**.

## THE ALJ'S FINDINGS

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled.  <u>Bowen v. Yuckert</u>, 482 U.S.137, 140 (1987).  <u>See also</u> 20 C.F.R. § 404.1520.  Plaintiff bears the burden of proof at Steps One through Four.  <u>See</u> <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999).  Each step is potentially dispositive.

At Step One, the ALJ found plaintiff had worked in substantial gainful activity for seven months in 1998 following the onset of her alleged disability, and although it is unclear whether she engaged in some substantial gainful activity

3 - OPINION AND ORDER

thereafter, the issue was not determinative of the ultimate outcome.

At Step Two, the ALJ found plaintiff has the following severe impairments under 20 C.F.R. §404.1520(c)(an impairment or combination of impairments is severe if it significantly limits an individual's physical or mental ability to do basic work activities):  myofascial pain syndrome and depressive disorder.

At Step Three, the ALJ found these impairments do not meet or equal a listed impairment.

The ALJ found plaintiff has the residual functional capacity to perform work that involves simple and routine tasks, no frequent fine motor manipulation, lifting up to 10 lbs occasionally and less than 10 lbs frequently, and standing or walking for two out of eight hours.

At Step Four, the ALJ found plaintiff is unable to perform her past relevant work.

At Step Five, the ALJ found plaintiff is able to perform other work that exists in significant numbers in the national economy, including the jobs of charge account clerk, order clerk, and sorter.

Consistent with the above findings, the ALJ found plaintiff was not under a disability and denied her claim for benefits.

## ISSUES ON REVIEW

Plaintiff asserts the ALJ's non-disability finding is flawed because the ALJ: failed to give clear and convincing reasons for rejecting plaintiff's testimony as to her limitations based on her lack of credibility; failed to give clear and convincing reasons for rejecting the opinions of treating physicians, Michael Plyman, M.D., Scott Northrup, D.C., and Kenneth Manuelle, D.O.; failed to give germane reasons for rejecting the lay witness testimony of plaintiff's friends, Beverly Trump and Amee Phillips, regarding plaintiff's daily activities; and improperly relied on erroneous vocational testimony regarding the jobs plaintiff is able to perform.

## LEGAL STANDARDS

**Burden of Proof**.

The initial burden of proof rests on the claimant to establish disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). To meet this burden, a claimant must demonstrate the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C § 423(d)(1)(A).

The district court must affirm the Commissioner's decision

5 - OPINION AND ORDER

if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if the "evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991). The duty to further develop the record, however is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001).

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.), cert. denied, 121 S. Ct. 628 (2000). "If additional proceedings can

remedy defects in the original administrative proceeding, a social security case should be remanded." <u>Lewin v. Schweiker</u>, 654 F.2d 631, 635 (9th Cir. 1981).

**RELEVANT RECORD**

1.    **<u>Plaintiff's Testimony</u>.**

Plaintiff testified at hearings held in September 2000 and August 2005.  She was 48 years old at the time of the second hearing.

<u>First Hearing - September 2000</u>.

Plaintiff has a high school diploma and attended Pacific University for one year, majoring in biology, before transferring to Portland Community College for one more year of higher education.  She did not obtain a college degree.

From 1979 until 1982, plaintiff worked at Intel as a computer chip quality control checker.  For nine months during 1987-1988, plaintiff worked as a drier tender, plugger, and veneer grader, which involved feeding 4' x 8' wet veneer sheets of variable thickness into a drying machine.

From December 1995 until July 1998, plaintiff was employed as a rural mail carrier.  She worked variable hours, filling-in for regular carriers.  She was required to be able to lift 70 lbs, and on occasion, lifted that much.  On the days she worked, she drove 3-4 hours and was on her feet for about five hours.

In November 1997, Plaintiff injured her neck, arm, and low
back in a non-job related automobile accident when another car
rear-ended the car she was driving.  She was off work as a result
of her injuries until March 1998 when she returned to her job as
a mail carrier.  She finally quit that job three months later
because she "was unable to it any longer."

Plaintiff was initially treated for her injuries by Randal
Garcia, M.D., and others in his clinic.  Thereafter, she was
treated by Nancy Keller, M.D., Michael Pylman, M.D., and Kenneth
Manuelle, D.O.  She also received significant chiropractic
treatment and physical therapy from Joseph Hodges D.C. and Scott
Northrup, D.C.

To relieve her pain symptoms, Plaintiff was prescribed
Oxycontin and, in addition, Oxy-IR, an immediate release pain
medication that blocks pain not otherwise relieved by the
Oxycontin.  She was also prescribed Beclovent as a muscle
relaxer, Celebrex as an anti-inflammatory, Klonopin for panic
disorder, Neurontin for nerve pain, and Paxil for depression.
Beclovent and Neurontin caused plaintiff to become drowsy.

Second hearing - August 2005.

Plaintiff received a settlement of $25,000 as a result of
the 1997 automobile accident, which she applied to her
outstanding medical bills.

From approximately April 2001 until May 2005, plaintiff worked part-time for a meat cutter, working three days a week, 7-9 hours a day, primarily wrapping meat.  She stopped working because the business shut down.  Plaintiff caught her hand in a meat tenderizer in November 2002 and required surgery to repair crushed bones in her left hand.  She also cut her finger, and dropped a heavy lid while attempting to clean it, resulting in intense pain in her wrist.  Plaintiff testified she had difficulty feeling objects with her hands if she was not looking at them.

Plaintiff now takes Norco (hydrocodone) for pain, Flexoril as a muscle relaxant, Celobrex and Wellbutrin for depression, and Levoxil for a thyroid problem.

Plaintiff complains that "it hurts to work" mostly because of neck and arm pain with muscle spasms, which cause her hand to go numb.  She states she has rejected possible neck surgery because the pain might remain the same or be less, and "it's not bad enough for me to go down and get my throat cut yet."  She occasionally gets dizzy and has some low back pain.  She guesses she could stand four hours at a time.  She was able to work as a meat wrapper eight hours a day, three days a week, during which she was on her feet most of the time.  Occasionally she worked an entire week because the work crew was short-handed, but she would

have to sit when she got home because of pain.  She was able to work with her hands in that job.  She missed work because of pain approximately once every three months.

Plaintiff believes she could work all day in a sit-down job, but her manual dexterity is limited because of numbness in both hands.  If she is careful, she is able to lift up to 40 lbs occasionally.  She has good concentration and memory because she takes medication.  Because of stress, however, her overall condition is perhaps a little worse than when she first testified.  Although there is no reason why she could not return to work part-time as a meat wrapper for her former employer if that job still existed, she would not be able to work full-time at any job.  She "supposes" she would be able to do a job that primarily involved sitting while assembling, sorting, or inspecting items.  She does have difficulty, however, with crocheting, because it makes her fingers numb.  In any event, she asserts "there isn't anything like that" where she lives.

2.  **Lay Witness Testimony**.

Amee Phillips.

In 1999, plaintiff's friend, Amee Phillips, completed a questionnaire as to plaintiff's daily activities.  Phillips stated she drives plaintiff to doctors' appointments.  Plaintiff rarely goes shopping but leaves her home daily "when not hurting."  Plaintiff has no difficulty relating with others.

10 - OPINION AND ORDER

Phillips drives plaintiff around because plaintiff's fingers "go
numb."  Plaintiff takes daily short walks, gets six hours of
broken sleep a day, and is able to take care of her personal
needs.  She fixes meals for herself and others.  Depending on her
pain level, plaintiff does household chores except vacuuming.
Plaintiff's pain medication helps but does not "solve the
problem."

In summary, in 1999, Phillips stated "[Plaintiff] is a work
horse, a dynamo, who has trouble accepting help from anyone and
now has to rely on someone else to get the basic things done."

Beverly Trump.

Trump has been a friend of plaintiff for 20 years.  From
1997 through 2003, Trump saw plaintiff about four times a year.
Plaintiff has changed significantly since the automobile
accident.  When she bakes now, she drops plates and she struggles
to get dressed.  Since the accident, plaintiff has difficulty
completing tasks such as loading laundry into a washer and she
can no longer chop or carry wood.  Plaintiff's pain has also
caused severe depression and an inability to focus as well as she
did before the accident.  Plaintiff's children do the housework.
She believes (incorrectly) plaintiff had a lot of sick days when
she worked as a meat cutter.

3.    **Plaintiff's Medical Records**.

Treating Physician Randal L. Garcia, M.D.

From December 1997 until August  1999, Dr. Garcia treated
plaintiff for pain resulting from the automobile accident.
X-Rays taken of the cervical spine in November 1997, January
1998, and August 1998 were normal.  MRIs of the neck in September
1998 and January 1999 showed normal disc spacing between C-3 and
C-7 with no evidence of herniation or disc bulging.  In September
1999, Dr. Garcia opined that plaintiff was limited to lifting
10 lbs occasionally for a period 2-3 hours in an 8-hour day,
and she could walk, stand, or sit up to 4 hours in an 8-hour day.
He concluded Plaintiff was able to perform "any type of sedentary
work."

Treating Chiropractor Joseph Hodges, D.C.

Dr. Hodges treated plaintiff from December 1997 until August
1998.  Plaintiff initially complained of constant moderate dull
pain with stiffness and soreness in her right lower and middle
back and constant severe dull, sharp, shooting, throbbing pain
with stiffness and soreness in her right upper back and both
sides of her neck.  She rated her pain level at 9 on a scale of
1-10, with 10 being the most painful.  Examination revealed
malalignment, malposition, subluxation and/or joint dysfunction,
with varying degrees of radiating pain from muscle spasm,
tenderness, and inflammation, all involving the shoulders,

cervical, thoracic, and lumbar spine.  Dr. Hodges treated plaintiff on average six times a month over the next eight months, primarily by adjusting various areas of the spinal column.  Plaintiff's level of pain ranged from a low of 5 to a high of 10 during that period.

In January 1999, based on his objective findings and plaintiff's subjective complaints, Dr. Hodges opined plaintiff "probably" could not work any longer as a rural mail carrier, but could work as a teller, cashier, or "delivery personal", lifting, carrying, or handling objects of 30 lbs or less.  She should be able to sit, stand, walk, and travel without limitation.  In summary, Dr. Hodges concluded plaintiff would be employable in a less demanding job if she had proper medications, although she would continue to suffer periodic exacerbations of chronic myofascitis.

Treating Chiropractor Scott Northrup, D.C.

Dr. Northrup treated plaintiff from September 1998 through June 1999, primarily with conservative, manipulative alignments of the cervical spine, electrical and ultrasound therapy, hot packs, and massage.  Dr. Northrup initially diagnosed plaintiff as suffering from acute post-traumatic cervical strain/sprain with nerve root compression and vertebrogenic radiculitis. During the course of her treatments, plaintiff complained of

varying degrees of pain in her neck and low back.  In January and
June 1999, Dr. Northrup opined plaintiff "will suffer permanent
partial soft tissue disability" in her cervical and lumbar spine.
He also opined plaintiff could work "in capacities such as
standing, sitting, desk or counter work" but she should not lift
more than 5 lbs, avoid overhead reaching, and limit her activity
to one hour.

Treating Physician Nancy Keller, M.D. - Family Practice.

Dr. Keller treated plaintiff for neck pain and probable
fibromyalgia from December 1999 through May 2000.  The goal of
the treatment was to get plaintiff "more functional right now"
and "onto a pain management level" that was comfortable to Dr.
Keller.  During the course of treatment Dr. Keller set a goal of
tapering down the "large amounts of [prescribed] narcotics"
plaintiff was taking and replacing them with long-acting pain
medication.

Treating Physician Michael Pylman, M.D. - Pain Management.

At the request of Dr. Keller, Dr. Pylman treated plaintiff
for severe right neck and arm pain resulting from "myofascial
pain and cervical stenosis" from February through July 2000.
In January 2001, Dr. Pylman completed a form in which he checked
boxes indicating that plaintiff had impairments that would cause
her to have "good days" and "bad days" likely causing her to miss
about four days of work each month.

<u>Treating Physician Thomas Pitchford, M.D.</u>

Dr. Pitchford treated plaintiff briefly to manage her pain
from August to October 1999.  He diagnosed chronic neck pain and
a hiatal hernia and continued her pain medication as previously
prescribed.

<u>Reporting Physician Kenneth W. Manuele, D.O</u>.

In January 2001, Dr. Manuele wrote a prescription that
plaintiff was "unable to work until neck better i.e. until neck
herniated disc problem is improved - treatment in place/ongoing,
but time [she] can return to work [is] uncertain at this time."

<u>Treating Physican Mark Silver, M.D. - Family Doctor</u>.

Dr. Silver and Family Nurse Practitioner Heidi Carlson, FNP,
treated plaintiff from January 2001 through February 2005.  In
October 2003, plaintiff reported increased pain in her neck
radiating down her right arm.  Two weeks later, she reported pain
radiating down her left arm.  In May 2004, plaintiff injured her
wrist.  In August 2004, plaintiff reported falling down and
twisting her lower back, causing radiating pain into her buttocks
and feet.

<u>Treating Nurse Practitioner Marguerite Smith, N.P.</u>

From December 2002 until July 2003, plaintiff visited the
Northwest Spine and Pain Center and was treated by Nurse
Practitioner Smith for her complaints of bilateral cervical

pain with radiculopathy.  As of July 2003, plaintiff was "doing well" and had "no new symptoms or no increase in symptoms."  She was trying to find part-time work, and was "managing her medications okay."

MRIs and X-rays.

Between 1998 and 2005, plaintiff underwent a CAT Scan and three MRIs.  An MRI in September 1998 revealed minimal disc bulging at the C5-6 and C6-7 levels, with no focal herniation or significant spinal stenosis.  A CAT scan and myelogram of the cervical spine in January 1999 showed a "mild extrinsic impression upon the thecal sac at the C-7 level" with an "otherwise normal spine CT scan with myelgram."  A cervical spine MRI in January 2003 showed a mild posterior disc bulge at the C5-6 and C6-7 levels, without significant neural foraminal narrowing or central canal stenosis.  An MRI in July 2005 showed a "small disc protusion . . . at C5-C6 with osteophytosis" on the right side, and a "moderately large disc protusion at C6-C7" on the right side with "nerve root encroachment."

DDS Consulting Physicians - Martin Kehrli, M.D.,
and Mary Ann Westfall, M.D.

Drs. Kehrli and Westfall examined the medical evidence to determine plaintiff's residual functional capacity.  They concluded plaintiff is able occasionally to lift 20 lbs, frequently lift 10 lbs, stand, walk, and sit, for 6 hours in

16 - OPINION AND ORDER

an 8-hour day, but she has limited ability to push or pull using the upper extremities. Plaintiff can climb ramps and stairs occasionally, but should avoid ladders, ropes, and scaffolds. She can also stoop, kneel, and crouch frequently, and crawl occasionally. She can occasionally reach overhead and frequently do shoulder high work. Plaintiff should avoid concentrated exposure to extreme heat and cold, humidity, and noise.

    DDS Examining Physician - Raymond Nolan, M.D.

    Dr. Nolan examined plaintiff at the request of the Commissioner in July 2005. He assessed chronic neck pain syndrome with probable right cervical radiculopathy, depression, chronic narcotic use, probable arthritis in the left knee, and peripheral neuropathy. Dr. Nolan concluded plaintiff should avoid repetitive neck bending or rotation and repetitive squatting or kneeling. Because of her complaint of low back pain she should learn appropriate lifting techniques and should lift up to 40 lbs only occasionally and 30 lbs frequently. She can sit, stand, and walk up to 6 hours in an 8-hour day. Dr. Nolan found plaintiff's finger range of motion was normal.

**4.  Vocational Expert (VE) Testimony.**

    At the first hearing, VE Francene Geers testified that plaintiff's prior jobs as a rural mail carrier and veneer grader involved medium work and her job as a computer chip quality

control checker was light work.  The ALJ asked a hypothetical as
to plaintiff's ability to work that incorporated the functional
limitations assigned to plaintiff by Dr. Garcia, *i.e.,* plaintiff
could lift 10 lbs occasionally for up to 2-3 hours, walk, stand,
or sit up to 4 hours, all in an 8-hour day, and do any sedentary
work.  The VE concluded plaintiff could perform the jobs of
sorter, addresser, and order clerk.

At the second hearing, the ALJ added to the hypothetical
plaintiff's inability to do jobs involving fine motor
manipulation in her hands.  The VE concluded plaintiff could
perform the jobs of charge account clerk, order clerk, and
sorter, of which there are approximately 100,000 such jobs in
the national economy and 130-150 in Oregon, and that none of the
jobs required fine motor manipulation in the hands.

### ANALYSIS

### 1.  Rejection of Plaintiff's Testimony.

The ALJ rejected in part plaintiff's testimony regarding the
extent of her work and daily activity limitations because he
found the testimony was not fully credible.

Standards.

A claimant who alleges disability based on subjective
symptoms "must produce objective medical evidence of an
underlying impairment 'which could reasonably be expected to

produce the pain or other symptoms alleged. . . .'" (the <u>Cotton</u>
test). <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 344 (9th Cir. 1991)
(quoting 42 U.S.C. § 423(d)(5)(A) (1988)). <u>See</u> <u>also</u> <u>Cotton v.</u>
<u>Bowen</u>, 799 F.2d 1403, 1407-08 (9th Cir. 1986). A claimant need
not produce objective medical evidence of the symptoms or their
severity. <u>Smolen v. Chater</u>, 80 F.3d 1276, 1281-82 (9th Cir.
1996).

If a claimant produces objective evidence that underlying
impairments could cause the pain she complains of and there
is no affirmative evidence to suggest the claimant is
malingering, the ALJ must provide clear and convincing reasons
for rejecting plaintiff's testimony regarding the severity of her
symptoms. <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993).
<u>See</u> <u>also</u> <u>Smolen</u>, 80 F.3d at 1283. To determine whether
plaintiff's subjective testimony is credible, the ALJ may rely on
(1) ordinary techniques of credibility evaluation such as the
claimant's reputation for lying, prior inconsistent statements
concerning the symptoms, and other testimony by the claimant that
appears less than candid; (2) an unexplained or inadequately
explained failure to seek treatment or to follow a prescribed
course of treatment; and (3) the claimant's daily activities.
<u>Id</u>. at 1284 (citations omitted).

Here, there is no evidence plaintiff is a malingerer. Moreover, there is objective medical evidence to support the existence of physical impairments, if not their severity.  The Commissioner, however, contends the ALJ gave clear and convincing reasons for finding plaintiff not entirely credible in her description of her physical limitations.  I agree.

The ALJ found plaintiff's statements concerning the "intensity, duration, and limiting effects of [her] symptoms were not entirely credible."  To support this finding, the ALJ noted Dr. Garcia's concern that plaintiff had overused her narcotic pain relievers.  In November 1998, Dr. Garcia placed plaintiff on a "drug holiday" because she was developing a tolerance to vicodin.  In March 1999, Dr. Garcia's nurse refused plaintiff's request for additional pain medication based on Dr. Garcia's notes.

The most significant reason the ALJ proffered for finding plaintiff only partially credible as to her limitations was plaintiff's actual work history after her automobile accident. She worked three full days a week for four years as a meat wrapper during which she stood almost the entire day and received no workplace accommodation.  During that time, plaintiff would miss about one day every three months.  The ALJ concluded that, although the work was less than full-time, it indicated that plaintiff could work in a less demanding sedentary job full-time.

Moreover, her work activities after the accident were inconsistent with plaintiff's assertion that she had difficulty with normal household chores and routine daily activities such as lifting, mopping, vacuuming, and driving.  Finally, plaintiff acknowledged she could work full-time if she were able to sit all day.

In addition, the ALJ noted the lack of objective findings to support the severity of plaintiff's claimed limitations.  The CAT scan and multiple MRIs taken over a span of seven years were consistent in finding only mild/minimal disc bulging with no spinal cord impingement, no significant spinal stenosis, and no focal herniation.

On this record, the court finds the ALJ stated clear and convincing reasons to question plaintiff's credibility as to the limiting effects of her impairments.  The court specifically notes the incongruity between plaintiff's work activities for seven years after the accident and her alleged inability to work in a far less strenuous sedentary job.

**2.    <u>Rejection of Opinions of Treating Physicians</u>.**

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant:

> Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for clear and convincing reasons supported by substantial evidence in the record.  Even if the treating doctor's opinion is contradicted by another doctor,

> the ALJ may not reject this opinion without
> providing specific and legitimate reasons
> supported by substantial evidence in the
> record.  This can be done by setting out a
> detailed and thorough summary of the facts
> and conflicting clinical evidence, stating
> his interpretation thereof, and making
> findings.  The ALJ must do more than offer
> his conclusions.  He must set forth his own
> interpretations and explain why they, rather
> than the doctors', are correct.

Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)(internal

citations omitted).  In turn, "the opinions of examining

physicians are afforded more weight than those of non-

examining physicians." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir.

2007).  The opinions of treating physicians should be credited as

true if the ALJ fails to provide clear and convincing reasons for

rejecting them.  See Smolen v. Chater, 80 F.3d 1273, 1992 (9th

Cir. 1996).

Here, the ALJ rejected aspects of the opinions of three of

plaintiff's treating physicians regarding her ability to sustain

full-time employment.

Michael Pylman, M.D.

As noted, Dr. Pylman treated plaintiff for myofascial pain

and cervical stenosis for a period of five months in 2000.  Six

months after his last examination, Dr. Pylman opined on a

preprinted form without explanation that plaintiff would miss

work at least four times per month and would have "good days" and

"bad days."

22- OPINION AND ORDER

The ALJ rejected Dr. Pylman's opinion that plaintiff would miss four work days a month because it was inconsistent with opinions of other treating physicians, such as Dr. Garcia, who opined plaintiff could perform any sedentary work, and Dr. Hodges, who opined plaintiff could work in a less demanding job than the medium exertion work she did as a mail carrier and veneer grader.  In addition, the ALJ again noted plaintiff's ability to work at the part-time but more physically demanding meat wrapper job while losing only one day every 3-4 months.

On this record, the court finds the ALJ stated clear and convincing reasons for rejecting Dr. Pylman's opinion.

<u>Scott Northrup, D.C.</u>

The ALJ rejected Dr. Northrup's chiropractic opinion that plaintiff's work activity should be limited to lifting no more than 5 lbs one hour at a time.  Instead, he accepted Dr. Hodges' chiropractic opinion that plaintiff's work limitations were far less restrictive, including lifting up to 30 lbs, and permitting sedentary work.  Moreover, the ALJ noted Dr. Hodges's greater experience.

On this record, the court finds the ALJ gave clear and convincing reasons for accepting Dr. Hodges' opinion rather than Dr. Northrup's opinion.

<u>Kenneth Manuelle, D.O.</u>

Dr. Manuelle's medical record consists of a single note in which he opined without explanation that plaintiff's return to work was "uncertain" until her "neck herniated disc problem is improved."  The ALJ rejected the opinion because Dr. Manuelle "appear[s] to have unquestionably accepted [plaintiff's] reporting of a severely herniated disc, which is not supported by the objective medical evidence."

The Commissioner asserts the ALJ properly rejected the opinion because it was conclusory and inconsistent with the rest of the evidence.  See <u>Batson v. Commissioner</u>, 359 F.3d 1190, 1194-95 (9th Cir. 2004)(The ALJ properly rejected a treating physician's opinion that "was in the form of a checklist, did not have supportive objective evidence, was contradicted by other statements and assessments of [the claimant's] medical condition, and was based on [the claimant's] subjective descriptions of pain.").

On this record, the court finds the ALJ gave clear and convincing reasons for rejecting Dr. Manuelle's disability opinion.

**3.    <u>Rejection of Lay Witness Evidence</u>.**

Plaintiff contends the ALJ failed to give appropriate credit to the testimony of her friends regarding her ability to work, her limitations, and her mental state.

The ALJ may reject the testimony of lay witnesses only by giving reasons germane to each witness whose testimony is rejected. *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996).

The ALJ accepted the perceptions of plaintiff's friends, Aimee Phillips and Bev Trump, regarding plaintiff's limited activities, but he was not persuaded that their perceptions of plaintiff's limitations outweighed other evidence, including plaintiff's ability to work part-time, on her feet for at least eight hours a day, three days a week for four years as a meat wrapper.

For all the reasons set forth above regarding plaintiff's credibility, her work history after the automobile accident, and the objective medical evidence, the court finds substantial evidence supported the ALJ's decision to discount the lay witness testimony regarding plaintiff's physical limitations. See Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001)("Substantial evidence supported the ALJ's decision to discount the family members' testimony.").

**4.   Adequacy of Vocational Expert Testimony.**

The VE found plaintiff's residual functional capacity, which includes the lack of "fine motor manipulation" skills, i.e., working primarily with the fingers, did not preclude plaintiff from performing the jobs of "charge account clerk", "sorter", and "order clerk".  Plaintiff argues the VE erred

because the jobs of "sorter" and "order clerk" require that skill.  The court agrees.  Nevertheless, the VE also found plaintiff's limitations did not preclude plaintiff from performing the sedentary job of "charge account clerk" of which there are substantial numbers in both the national and regional economies.  That job does not require "fine motor manipulation." On this record, the court concludes any error by the VE in opining that plaintiff could perform the jobs of sorter and order clerk is harmless.  <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005)("A decision of the ALJ will not be reversed for errors that are harmless.").

Nevertheless, plaintiff also contends she is unable to perform the job of "charge account clerk" because the ALJ found plaintiff was limited to jobs involving "simple routine tasks." Plaintiff notes the job of "charge account clerk" requires an ability to perform at a general educational development (GED) level of 3, at which an employee should be able to:

> Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form.  Deal with problems involving several concrete variables in or from standardized situations.

Dictionary of Occupational Titles (DOT) Appendix C.[1]

Plaintiff contends that because she is limited to performing "simple, routine tasks" she cannot perform any job requiring

---

[1] The DOT is available at http/www.occupationalinfo.org.

the level of complexity described.  I disagree.  DOT requirements do not pertain to functional limitations of a particular job, but to "those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." DOT App. C III.  I agree with the Commissioner that these requirements reflect only the amount of formal or informal education, _i.e._, elementary school, middle school, high school, college, work experience, and/or self-study, that is considered necessary to perform the job.  The record reflects plaintiff has two years of college, which more than satisfies the educational level for the job of "charge account clerk."

Accordingly, the court concludes the VE did not err in concluding that plaintiff could perform the job of charge account clerk in light of her educational background and her residual functional capacity.

## CONCLUSION

For the reasons stated above, the Commissioner's final decision denying benefits to plaintiff is **AFFIRMED** and this matter is **DISMISSED** with prejudice.

IT IS SO ORDERED.

DATED this 23 day of April, 2008.


    /s/  Malcolm F. Marsh
MALCOLM F. MARSH
United States District Judge


27- OPINION AND ORDER

28 - OPINION AND ORDER